3:22-MJ-1026

FILED
FEB 0 3 2022
Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

# AFFIDAVIT

I, Jonathan Wilson, a Special Agent ("SA") with Homeland Security Investigations ("HSI") being duly sworn, depose and state that:

## Introduction

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for authorization for real-time geolocation data about the location of, as well as historical location and account data regarding the cellular telephone bearing the number 213-300-7971 ("TARGET PHONE"), and believed to be used by FNU LNU a/k/a "Mary", hereinafter "MARY." The TARGET PHONE is serviced by AT&T wireless.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3123(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

## Agent Background and Experience

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am cross designated, and have the authority to conduct Title 21 investigations and enforcemen tactivities. I have been involved with investigations for Title 21 offenses and am

1

familiar with the Interagency Cooperation Agreement between the Drug Enforcement Administration (DEA) and ICE dated June 18, 2009.

2.     I am a Special Agent with Homeland Security Investigations (HSI) and have been since March 2020. In March 2021, I successfully completed both the Criminal Investigator Training Program (CITP) and HSI Special Agent Training (HSISAT) at the Federal Law Enforcement Training Center. From 2017 until 2020, I was employed as a Detective with the Clinton, TN Police Department. From 2011 until 2017, I was employed as a police officer with the Oak Ridge, Tennessee Police Department. During my time in local law enforcement, I was also assigned to the 7th Judicial District Violent Crime and Drug Task Force in Anderson County, TN. In 2012, I attended and completed the Basic Police School at the Tennessee Law Enforcement Training Academy in Donelson, TN. In 2011 I earned my B.S. Degree in Criminal Justice from Middle Tennessee State University (MTSU) in Murfreesboro, TN. I have received extensive training pertaining to narcotic investigations and the investigations of various crimes that arise from drug trafficking activities. I have become familiar with the methods, operations, and schemes commonly employed by individuals involved in the violation of narcotics statutes through my training and prior experience, including previous cases I have investigated with other municipal, state, and federal agents. I have investigated many cases in the Eastern District of Tennessee and elsewhere involving violations of state and federal narcotics statues and, as a result, I have been successful in arresting and convicting numerous individuals associated with narcotics distribution. I have been involved in the execution of numerous search warrants dealing with the detection and investigation of federal narcotics violations. I have participated in federal and state wiretap investigations and prosecutions. As a result of these investigations and prosecutions, I have become aware of various methods and techniques utilized by individuals within the Eastern

2

District of Tennessee and elsewhere to sell and distribute controlled substances. I have become familiar with codes, slang terms, and other terminology used to refer to controlled substances by narcotics traffickers within the Eastern District of Tennessee and elsewhere. I am familiar with the operations of illegal drug trafficking organizations in various parts of the world, including the Eastern District of Tennessee, the Southeastern United States, and Mexico.

3. Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving quantities of controlled substances, including crystal methamphetamine and other controlled substances, I know the following:

   a. the methods in which smugglers and drug traffickers conduct their business, including but not limited to, their methods of importing and distributing drugs;

   b. their use of conveyances in the conduct of their business;

   c. their use of cellular telephones (cell phones) and other cellular communication devices;

   d. their use of numerical codes and code words to conduct their transactions;

   e. methods of laundering drug proceeds;

   f. smugglers and drug traffickers oftentimes use cell phones to communicate about their drug trafficking activities (via telephone calls and / or text messaging) and that they oftentimes use the cell phones take photographs of their drugs, drug proceeds, and/or stash locations;

   g. smugglers and drug traffickers oftentimes conceal drugs and/or drug proceeds in vehicles to avoid law enforcement detection when transporting drugs and/or drug proceeds.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving controlled substances, I know that drug traffickers commonly use cellular telephones to facilitate their drug trafficking activities. Like most everyone else in this day and age, drug traffickers typically keep their cellular telephones on or near their person around the clock.

6. Providers of cellular services have the ability to provide geolocation information for phones on their network. When this information is made available to law enforcement, investigations of drug trafficking groups are advanced in at least two important ways. Knowing an approximate location of a particular phone greatly facilitates and enhances physical surveillance of the user of that phone and other criminal actors with whom the user associates. Moreover, officers and agents can conduct physical surveillance more conservatively, which helps protect the covert nature of the investigation. Secondly, the availability of geolocation information enables law enforcement to monitor and log the user's movements over time and space. This provides insight into locations commonly visited by the user, which can lead to the identification of other associates, either through their association with known physical locations or by helping law enforcement prioritize and select future physical surveillance locations.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show

merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a District Court of the United States that has jurisdiction over the offense being investigated.

## Probable Cause

9. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, and have been committed, are being committed, and/or will be committed by the user of the TARGET PHONE, and others, known and unknown, as explained below. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and/or will lead to the identification of individuals who are engaged in the commission of these offenses. In summary, MARY distributes methamphetamine from Arizona into the Eastern District of Tennessee and elsewhere.

10. After law enforcement began investigating a methamphetamine ("meth") distribution ring in the Eastern District of Tennessee, law enforcement sought and received a federal wiretap on a phone used by Gregory FLEENOR ("FLEENOR PHONE"). FLEENOR is a prisoner coordinating the distribution of methamphetamine in the Eastern District of Tennessee and elsewhere. Law enforcement has made at least one controlled purchase of methamphetamine in the Eastern District of Tennessee that was coordinated by FLEENOR.

11. Pursuant to the wiretap, law enforcement intercepted several calls and text messages between FLEENOR, using the FLEENOR PHONE, and MARY, using the TARGET PHONE. In these calls and text messages, FLEENOR and MARY discussed FLEENOR paying for

5

methamphetamine and procuring additional supply of methamphetamine from MARY to sell. Based on calls and texts between MARY and FLEENOR, as well as other information developed during this case, including a prior federal wiretap on a phone used by FLEENOR's subordinate, law enforcement learned FLEENOR's subordinates send cash payments to MARY in packages and MARY then sends methamphetamine to FLEENOR's subordinates in Tennessee using package shipping companies. Law enforcement previously intercepted a package containing more than $25,000 that was shipped to an address in Arizona believed to be used by MARY, that was shipped by FLEENOR's subordinate.

12. On or about January 24, 2022, pursuant to a federal wiretap on FLEENOR PHONE, law enforcement intercepted FLEENOR using the FLEENOR PHONE to speak with MARY, who was using the TARGET PHONE. Portions of the call are transcribed below:

FLEENOR: 'Cause I'm gon... I'm gonna take and come back and just maybe go for, like, eighteen (18) a piece to pull in clientele then I'll go up on them.
MARY: Yeah.
FLEENOR: You know what I'm sayin'? I'll make... I'll make my money after they need me.

….(later in the call)

FLEENOR: And, uh... I guess we better go with UPS this time. I think we went with FedEx last time. We'll do UPS this time, the next time we'll do FedEx. We'll go back and forth.
MARY: Alright.
FLEENOR: I think that's the best route to do, uh... for right now.
MARY: Okay, I'll do that. Yeah, it's a good idea to do back and forth.
FLEENOR: And it's all big bills, so...
MARY: Wait, it's for six (6) of them, right?
FLEENOR: I've got 'em in the hand, we're just swappin' it out. Yup, six (6) of them now.
MARY: Okay. Alright, I will talk to you tomorrow...

13. Based on my training and experience, as well as the context within this investigation, I believe that during this call, FLEENOR told MARY that he is going to charge his meth customers $1800 a pound of methamphetamine at first, then raise the price ("'Cause I'm gon... I'm gonna take and come back and just maybe go for, like, eighteen (18) a piece to pull in clientele then I'll go up

6

on them.") Later in the call, FLEENOR told MARY that he is going to send her cash ("all big bills") and requested the meth be sent by UPS this time, because MARY alternates between UPS and FedEx when sending meth ("We'll do UPS this time, the next time we'll do FedEx. We'll go back and forth."). MARY then asked if FLEENOR wanted six pounds of methamphetamine ("it's for six (6) of them, right?") and FLEENOR confirmed that was true ("Yup, six (6) of them now.").

14. In summary, I believe that MARY, the user of the TARGET PHONE, is supplying FLEENOR with pounds of methamphetamine in exchange for cash shipments. As such, the location of the TARGET PHONE will provide valuable evidence in the investigation including confirming the identity of MARY, and allowing law enforcement to learn her location and movements related to her drug trafficking operations, including trips to shipping facilities and/or potential stash houses for drugs and/or cash proceeds.

**Technical Information**

15. In my training and experience, I have learned that many wireless cellular telephone service providers provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers

7

are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

16. In my training and experience, I have learned wireless cell phone service providers provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

17. Based on my training and experience, I know that wireless providers can collect cell-site data. I also know that wireless providers such as wireless providers typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes Based on my training and experience, I know that wireless providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic

8

personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user or users of the TARGET PHONE and may assist in the identification of co-conspirators.

## AUTHORIZATION REQUEST

18. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

19. This is a long term investigation of a sophisticated Drug Trafficking Organization that is operating in multiple states, involves the use of informants, confidential sources, judicially authorized wiretaps, surveillance, and other investigative methods. I do not anticipate that this investigation will be completed in the near future. I therefore request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until June 26, 2022, after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the TARGET PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant,

the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

20. I further request that the Court direct the relevant wireless provider to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the wireless provider I also request that the Court direct the wireless provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the wireless provider's services, including by initiating a signal to determine the location of the TARGET PHONE on the wireless provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the wireless provider for reasonable expenses incurred in furnishing such facilities or assistance.

21. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET PHONE outside of daytime hours.

Respectfully submitted,

_____
Jonathan Wilson
SA, HSI

Subscribed and sworn to before me on January 31, 2022

_____
DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone bearing the number 213-300-7971 ("TARGET PHONE"), and believed to be used by FNU LNU a/k/a "Mary." The TARGET PHONE is serviced by AT&T wireless.

2. Records and information associated with the above cell phone numbers that are within the possession, custody, or control of the wireless provider, including information about the location of the cellular telephone, including if the TARGET PHONE is subsequently assigned a different call number.

## ATTACHMENT B

## Particular Things to be Seized

**Information to be Disclosed by the Provider**

I. **Prospective Geo-location Information**

All information about the location of TARGET PHONE described in Attachment A for a period of 60 days, during all times of day and night. "Information about the location of the TARGET PHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, Per Call Measurement Data (PCMD), and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the wireless service provider, the wireless service provider is required to disclose the Location Information to the government. In addition, the wireless service provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the wireless service provider's services, including by initiating a signal to determine the location of the TARGET PHONE on the wireless service provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the wireless service provider for reasonable expenses incurred in furnishing such facilities or assistance.

2

## II. Historical Cell-Site and Other Account Information

For the date range of January 1, 2022 to January 31, 2022, for the TARGET PHONE ("the Accounts")

    a. The following information about the customers or subscribers of the Accounts:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

3

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Accounts, including:

   i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

4